IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

**RHONDA L. BRISCOE,**

        **Plaintiff,**

v.                                            **CASE NO. 2:12-cv-01028**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

      This is an action seeking review of the final decision of the Commissioner of Social Security that the plaintiff was no longer disabled as of June 1, 2005. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). The plaintiff has chosen to represent herself, both at the administrative hearings and before this court. She did not file a memorandum in support of her claim.

      The plaintiff, Rhonda L. Briscoe, (hereinafter referred to as "Claimant"), was found to be disabled as of November 2, 2000, when she was undergoing treatment for oat (or small) cell carcinoma of the lung. On June 9, 2005, the Social Security Administration determined that her disability had ceased as of June 1, 2005. (Tr. at 116-118.) She requested reconsideration of that decision at a hearing, which was held on March 10, 2006. (Tr. at 88, 112-115.) On June 13, 2006, a State Disability Hearing Officer determined that Claimant was not disabled as of June 1, 2005. (Tr. at 88-95.)

On September 26, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 77-78.) A hearing was set for January 10, 2007, but Claimant did not appear. The assigned ALJ, the Hon. Theodore Burock, found that Claimant had not shown good cause for her failure to appear and dismissed her request for hearing. (Tr. at 40-41.) On September 21, 2007, the Appeals Council reversed that decision and remanded the case to the ALJ for a hearing. (Tr. at 12-14.)

Three hearings were held before the ALJ, on April 8, 2008, August 26, 2009, and April 28, 2010, at which Claimant, her husband, and medical and vocational experts testified. (Tr. at 812-901.) On June 17, 2010, the ALJ made findings and decided that Claimant's disability ended as of June 1, 2005. (Tr. at 19-36.) Claimant submitted a letter dated July 28, 2010 to the Appeals Council, requesting review. (Tr. at 807-11.) On April 5, 2012, the Appeals Council considered her letter and denied her request for review. (Tr. at 7-9.) Claimant filed this action on April 10, 2012. (ECF No. 2.)

The Social Security Regulations establish an eight-step evaluation process for determination of whether a claimant's disability ceased as of a particular date. 20 C.F.R. § 404.1594 (2011). The first inquiry is whether a claimant was engaged in substantial gainful employment. Id. § 404.1594(f)(1). If the claimant was not so engaged, the second inquiry is whether the claimant suffered from a severe impairment or combination of impairments which met or equaled any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1594(f)(2). If not, the third inquiry is whether the claimant had medically improved as shown by a decrease in medical severity. Id. § 404.1594(f)(3). If there had been a medical improvement, the fourth inquiry is whether the improvement was related to the

2

claimant's ability to do work in accordance with § 404.1594(b)(1) through (b)(4), that is, whether there had been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. Id. § 404.1594(f)(4). If there had not been medical improvement, or if the medical improvement was not related to the ability to do work, the fifth inquiry is whether the exceptions in § 404.1594(d) or (e) apply. If there had been medical improvement which was related to the claimant's ability to do work, the sixth inquiry is whether all of the claimant's impairments in combination were severe, as defined by § 404.1521. Id. § 404.1594(f)(6). If the combination of impairments was severe, the seventh inquiry is whether the claimant was able to do substantial gainful activity as set forth in § 404.1560, that is, whether the claimant's residual functional capacity would indicate that the claimant could perform his or her past relevant work. Id. § 404.1594(f)(7). If the claimant cannot perform past relevant work, the final and eighth inquiry is whether the claimant could do other work. Id. § 404.1594(f)(8).

     In this particular case, the most recent favorable medical decision finding that Claimant was disabled is the determination dated October 30, 2002, which is known as the "comparison point decision" or CPD. At the time of the CPD, Claimant's impairments were oat cell carcinoma of the lung and emphysema. (Tr. at 21.) The ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity through June 1, 2005. (Tr. at 10.) Under the second inquiry, the ALJ found that as of June 1, 2005, Claimant suffered from the severe impairments of chronic obstructive pulmonary disease ("COPD"), alcohol abuse and depression/anxiety. (Tr. at 21.) The ALJ further found, at the second inquiry, that as

3

of June 1, 2005, Claimant's impairments, considered individually or in combination, did not meet or medically equal the severity of an impairment listed in Appendix 1. (Tr. at 22.) At the third inquiry, the ALJ concluded that as of June 1, 2005, Claimant had experienced medical improvement of the impairment present at the time of the CPD, in that the cancer was in remission. (Tr. at 23.) At the fourth inquiry, the ALJ found that Claimant's medical improvement was related to her ability to work. (Tr. at 23-24.) Because the ALJ found that the improvement was related to her ability to work, he skipped the fifth inquiry and proceeded to the sixth. He concluded that Claimant's impairments of COPD, alcohol abuse and depression/anxiety as of June 1, 2005, were severe, as defined by § 404.1521, in that they significantly limited her physical or mental abilities to do basic work activities. At the seventh inquiry, the ALJ found that as of June 1, 2005, Claimant could not perform her past relevant work as a shirt presser. (Tr. at 26.) At the eighth and final inquiry, the ALJ determined that as of June 1, 2005, if she stopped abusing alcohol, Claimant could perform other work as a price marker, retail sales attendant, or inspector/sorter. (Tr. at 36.) On this basis, the ALJ concluded that Claimant's disability ended as of June 1, 2005. (Tr. at 36-37.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

4

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was 46 years old as of June 1, 2005. (Tr. at 26.) Claimant has a limited education, as she did not complete high school. (Tr. at 26.) Claimant's prior employment was unskilled. (Tr. at 26.)

Claimant's Challenges to the Commissioner's Decision

Claimant did not file a memorandum in support of her claim. The letter which she submitted to the Appeals Council with her Request for Review of Hearing Decision/Order states, in pertinent part, as follows:

> The ALJ decision is wrong as I am now and have been disabled since June 1, 2005 and before.
> Page 4, paragraph 5: ALJ said Claimant's impairment did not meet "Listings." However, a finding of "not meeting" a "listing" is not the same as "not disabled."
> Page 5, paragraph 6: ALJ said medical improvement occurred as of June 1, 2005. This is not the same as "not disabled."
> Page 6, paragraph 8: ALJ rightly found Claimant's impairments as of June 1, 2005 caused more than minimal limitation . . . .
> Page 6, paragraph 9: ALJ said record showed Claimant has hospitalized May 30, 2006-June 3, 2006 for drinking up to 18 beers plus one pint of vodka per day. Please note one year after ALJ finding disability ceased June 1, 2005. Moreover, at the time of admission she had suicidal ideation and had attempted suicide by cutting her wrists.
> Page 7: On January 12, 2007, Claimant was at emergency room with

5

complaints of <u>drinking</u> too much and feeling depressed.

On February 8, 2007, Dr. Voltin, M.D. performed a psychiatric evaluation and reported: " . . . she stopped drinking . . . two to three weeks ago."  (Mid Jan. 2007)

On April 13, 2007, Claimant was hospitalized due to suicidal ideation.  Claimant was discharged then (10) days later, with diagnoses of: bipolar disorder, moderate to severe, manic/depressed with rapid cycling and personality disorder . . ."  In the same paragraph: Dr. Blair testified that it was probably still as a result of her long history of substance use.

Page 8: Dr. Blair testified that some point in time Claimant's substance use became non-severe.  He stated that quitting alcohol in January 2007 did <u>not</u> completely solve Claimant's problems as it is a gradual process . . . . Dr. Blair <u>was</u> unsure as to when the claimant's substance abuse became non-severe.  Sobriety takes time, but since it was in 2007, Dr. Blair was discussing, the ALJ selection of June 1, 2005 <u>cannot</u> stand.

Page 8: Claimant was born October 21, 1958.  Therefore, at the time of the hearing, Claimant was fifty (50) years of age.  If, as I contend, ALJ used the wrong date (June 1, 2005), (and Dr. Blair said it takes time, in 2007), maybe, just maybe, I was closer to 50, <u>and</u> not a younger individual.

Page 9: ALJ said the V.E. testified there are <u>NO</u> jobs Claimant could perform.  Then, however, ALJ studied whether not using substances would not have an impairment that meets or equals any listed impairments.  Again, I contend <u>not</u> meeting a listing is not the same as no impairment.

Page 12: ALJ, when discussing my testimony says there is <u>no</u> evidence to support same.  However, ALJ fails to cite <u>any</u> evidence to refute my words.  Also, page 12, ALJ concluded my inability to stop smoking in some way reflects poorly on my credibility.  Why?  How?

Page 15: ALJ stated: "Dr. Blair stated that all the records dated prior to January 2007 were heavily influenced by alcohol.  Moreover, Dr. Blair testified that when Claimant stopped drinking, her psychological condition started to get better and became non-severe.  Furthermore, Dr. Blair testified that from January 2007 forward, Claimant still had evidence of some depression and anxiety.  In fact, Dr. Blair stated Claimant's limitation in performing routine, repetitive acts was <u>most prevalent in 2007</u> (not June 1, 2005, nor did the problems go away then).

Page 17: ALJ made this statement (last paragraph before # 18, " . . . for the period of time that the claimant was abusing alcohol she was unable to perform work activity."  Accordingly, the evidence supports <u>that after ceasing</u> her alcohol abuse, the claimant became able to perform the jobs . . . ."

Page 18: ALJ said, "Based on the testimony of the vocational expert, the undersigned concludes that as of June 1, 2005, if the claimant stopped the substance use, . . ."

6

> ALJ discredited most of my medical evidence in favor of government paid witnesses. That is anything but a fair result.
> His Doctor Blair testified that as long as I was abusing substances (such as alcohol), I was impaired. The ALJ concluded (¶ 18) if I had stopped the abuse . . ., but then her [illegible] June 1, 2005 as the date when Doctor Blair said it was sometime after the hospitalization, but quitting in 2007 did <u>not</u> completely solve my problems as it is a gradual process.
> I am still disabled and you should so find. At the least, a new hearing with a new ALJ.

(Tr. at 807-811.)

It appears that Claimant believes that her physical and mental condition during the entire period from June 1, 2005 to the date of the last administrative hearing on April 28, 2010, is under review. That is not true; the court's review is limited to a determination of whether the Commissioner's decision is supported by substantial evidence. The Commissioner's decision related to whether Claimant was capable of substantial gainful activity as of June 1, 2005, if she had not been abusing alcohol at that time.

Claimant does not appear to dispute that the ALJ correctly identified her impairments as of June 1, 2005 as COPD, alcohol abuse, and depression/anxiety. The court will summarize the evidence which relates to those impairments during the relevant time period. There is no dispute that as of June 1, 2005, Claimant's small cell carcinoma was in remission. Due to the limited scope of review, the undersigned has reviewed, but not summarized, the mental and physical health evidence after April of 2007.

<u>Mental Health Evidence</u>

On March 28, 2004, Claimant presented at Thomas Memorial Hospital, drunk,

claiming that she wanted to kill herself. (Tr. at 726-27.).) When questioned, she denied being suicidal. (*Id.*) Her primary care physician was listed as Dr. Viradia.

On April 17, 2004, Claimant again presented at Thomas Hospital, drunk, depressed and suicidal. (Tr. at 720-23.)

On November 12, 2004, Claimant visited Prestera Center for Mental Health Services, Inc. and she was interviewed. (Tr. at 288-301.) The evaluation of her impairments was based solely on her reports about herself. (Tr. at 295.) She had been referred to Prestera by Highland Hospital as a self-mutilating alcoholic. (Tr. at 295.) Her problems were alcoholism, depression and anxiety. (Tr. at 299-300.) She never returned to Prestera. (Tr. at 289.)

Two pages of medical records from Arvind Viradia, M.D., dated May 13, 2004 and January 7, 2005, are mostly illegible, although it appears that he prescribed Trileptal, an antiepileptic drug, and Zoloft, an antidepressant. (Tr. at 321-33.)

The record contains information relating to Claimant's hospitalizations at Highland Hospital in January, 2005. (Tr. at 324-332.) She had previously been hospitalized there in October of 2004. (Tr. at 327.) During her hospitalization from January 14-19, 2005, the discharge diagnosis was:

Axis I  Major Depressive Disorder, Recurrent, Severe
    Alcohol Dependence with Recent Relapse
    Nicotine Dependence
Axis II  Deferred
Axis III Status Post Small Cell Lung Cancer with Chemotherapy and Radiation
    Currently in Remission x 4 1/2 years
    Chronic Pain Involving the Leg
    Emphysema
    Thyroid Disease
    Three Healing Lacerations, Self-Inflicted with Early Granulation to the
    Legs and Face Bilaterally

| | |
|---|---|
| Axis IV | Level of Psychosocial Stressors are Severe including alcohol relapse with increased/worsening symptoms of clinical depression, pathological anxiety, recent self-mutilation to the face and legs with potential scarring, marital and family stress secondary to recent actions and problems, chronic mental illness and physical illness. |
| Axis V | GAF is 50. |

(Tr. at 328.)

Shortly after her discharge, Claimant began to drink alcohol, became agitated, and had suicidal thoughts and depression. (Tr. at 324.) She went to Thomas Memorial Hospital (tr. at 379-80, 718-19) and subsequently was admitted to Highland Hospital on January 21, 2005 (tr. at 324). The discharge diagnosis on January 27, 2005 was:

| | |
|---|---|
| Axis I | Major Depressive Disorder, Recurrent<br>Alcohol Abuse and Dependence |
| Axis II | No Diagnosis |
| Axis III | Status Post Lung Cancer in Remission |
| Axis IV | Level of Psychosocial Stressors is Moderately Severe |
| Axis V | GAF = 55. |

(Tr. at 325.)

On March 21, 2005, Claimant underwent a psychological evaluation and mental status examination by Joann B. Daley, M.A., M.A., Ed. S., a licensed clinical psychologist. Ms. Daley diagnosed Claimant as follows:

| | |
|---|---|
| Axis I | Mood Disorder NOS<br>Alcohol Dependence, in Remission<br>Hallucinogen Dependence, in Remission |
| Axis II | No Diagnosis |
| Axis III | Lung Cancer, Clinically Stable, by History |

(Tr. at 337.) Ms. Daley explained that the "Mood Disorder NOS diagnosis is based on her symptoms of mania and depression that do not meet the criteria for a specific diagnosis." (*Id.*)

On May 13, 2005, a State medical consultant, Jeffrey Harlow, Ph.D., reviewed

9

Claimant's mental health records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (Tr. 359-77.) He determined that Claimant had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. at 369.) There was no evidence of Claimant met the "C" criteria. (Tr. at 370.) Dr. Harlow commented that she "can perform repetitive one and two step work-like activities on a sustained basis." (Tr. at 371, 376.) He assessed Claimant as being moderately limited in the following abilities: remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 374-75.) Otherwise he found her abilities to be not significantly limited. (*Id.*)

There is scant mental health evidence from 2006 in the record. On May 30, 2006, Claimant presented at Thomas Hospital, drunk, depressed and suicidal, with a history of cutting herself when she drinks. (Tr. at 698-700, 705-06.) On June 23, 2006, she sought treatment at Southern Psychiatric Services, PLLC, seeing Elizabeth A. McClellan, M.D. (Tr. at 520-33.) She did not return until January 2, 2007. (Tr. at 521.)

10

In January of 2007, Claimant experienced an increase in symptoms of mania and depression, and consumed a lot of alcohol, resulting in her being evaluated in several hospitals, and spending a short period in jail for striking a nurse. (Tr. at 460—64, 466-76, 690-95.)

On April 13, 2007, Claimant presented to Thomas Hospital, having taken an overdose of Klonopin. (Tr. at 678-87.) Her diagnoses at discharge on April 17 were hyponatremia (insufficient levels of sodium in the body fluids), depression and suicidal ideation. (Tr. at 677.) She spent a few days on the psychiatric ward and improved. (Tr. at 666-70.) She returned to Thomas Hospital on April 26, 2007, complaining of shortness of breath, dry mouth, nausea, and feeling ill. (Tr. at 671-73.)

Physical Health Evidence

The record contains medical evidence from Arvind Viradia, M.D., beginning on August 25, 2003. (Tr. at 770.) She complained of being "nervous all the time," for which he prescribed Zoloft, Xanax and Klonopin. (Tr. at 769.) Claimant had office visits with Dr. Viradia on September 15 and 29, 2003, January 22 and May 13, 2004, and January 7, April 6, and November 30, 2005. (Tr. at 762-68.) While most of the notes are illegible, it is apparent that Dr. Viradia diagnosed major depression. (*Id.*) The record contains further treatment notes of Dr. Viradia from 2006 through August, 2009. (Tr. at 746-60.)

On March 28, 2004, an x-ray of Claimant's lumbar spine showed "mild degenerative arthritis" with mild narrowing of the L5-S1 disc space and the facet joints in the lower lumbar spine. (Tr. at 729.)

On December 2, 2004, Claimant had a routine follow-up examination by Dr.

11

Arvind B. Shah for her lung cancer. (Tr. at 302.) His impression was "clinically stable." Id.

On April 4, 2005, Claimant underwent an internal medicine examination by Kip Beard, M.D. (Tr. at 338.) She told Dr. Beard that she has generalized body aches. (*Id.*) Her examination was normal in all respects, with no tenderness or spasm in her spine, hips, or extremities. (Tr. at 340-41, 343-44.) Dr. Beard's impression was that she was status post chemotherapy and radiation therapy for small cell lung cancer. (Tr. at 341-42.) A pulmonary function study indicated "Mild COPD with moderate restrictive disease. No significant improvement after bronchodilation." (Tr. at 347-49.)

On April 26, 2005, a State medical consultant, Rafael A. Gomez, M.D., reviewed Claimant's medical records and concluded that she could perform work at the light level (occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8 hour day, with unlimited pushing and/or pulling). (Tr. at 352.) He indicated that she could frequently climb ramps and stairs, stoop, kneel and crouch, and occasionally climb ladders, ropes and scaffolds, and balance. (Tr. at 353.) Dr. Gomez found no manipulative, visual or communicative limitations. (Tr. at 354-55.) He found no limitation in her exposure to noise and vibration, and suggested that she avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 355.)

On June 18, 2005, Claimant presented at Thomas Hospital, complaining of back pain. (Tr. at 714-16.) She had an x-ray of her lumbar spine which was read as "negative." (Tr. at 644, 713.)

On June 23, 2005, Claimant was examined by Samer Nasher, M.D., a neurologist, who concluded that Claimant complained of chronic back pain with recent exacerbation and symptoms suggestive of L3 radiculopathy. (Tr. at 430.) Her general and neurological examinations were normal, except for some mild muscle spasms at the thoracic and lumbar spine, some tenderness at L1/L2, and decreased pinprick sensation on her hands and forearms. (*Id.*) Dr. Nasher saw Claimant again on July 7, August 29, September 29, October 27, November 30, and December 16, 2005. (Tr. at 436-447, 633-43.) She had an MRI on December 3, 2005, which was read as showing the following:

> Vertebral body heights are preserved. Alignment is normal. No compression deformity is seen. No signal abnormality noted in the vertebral body to suggest metastatic disease. Discs also have normal signal. No disc herniation or spinal stenosis seen.

(Tr. at 436, 709.) Claimant saw Dr. Nasher again on January 13, 2006. (Tr. at 433, 633.) All of the notes from her appointments are illegible. Dr. Nasher's follow up report, dated March 1, 2006, reads as follows:

> The patient was seen on March 1, 2006 for a follow up appointment. The patient stated that she continued to have daily back pain about seven on a scale of 10 and she is averaging about four Vicoprofen daily. It is not moving to her legs at this time.
> * * * The patient tried to go to work with her sister but her agoraphobia is getting worse and she had multiple panic attacks. Sometimes she may have two a day and sometimes one or two a week. * * *
> PHYSICAL EXAM: General and neurological examination was normal except for spasm of the lumbar spine with mild tenderness over L4 and 5.
> IMPRESSIONS:
>     1.  Chronic low back pain and back spasm.
>     2.  Panic disorder with agoraphobia.
>     3.  Depression and emphysema.
>     4.  Fatigue syndrome and flu infection.
> RECOMMENDATIONS:
>     1.  The patient has not seen her psychiatrist Dr. El-Khatib at this

>     time.
>     2.  I feel that the patient has limited ability to do physical activities and she may need significant adjustment to restart different type of job where she can avoid meeting a lot of people or lifting heavy things.

(Tr. at 432, 627.) Dr. Nasher saw Claimant on March 10, 2006, when she wanted a refill on medicine. (Tr. at 626.) On March 29, 2006, Claimant wanted Lortab, because Percocet was not helping for her back pain. (Tr. at 624.) Dr. Nasher prescribed Lortab 10 mg. (*Id.*) On April 11, 2006, she saw Dr. Nasher. (Tr. at 625.) On June 1, 2006, Dr. Nasher saw Claimant at Thomas Memorial Hospital where she was admitted for attempting to cut her wrist while she was drunk. (Tr. at 620.) She had been drinking up to 18 beers and a pint of vodka per day. (Tr. at 613.) On August 10, 2006, Claimant had an x-ray of her lumbar spine which was read as follows: "Vertebral body height is preserved. Alignment is normal. The disc space is well maintained. No compression fracture is seen. Minimal facet joint degenerative change is noted in the lower spine." (Tr. at 614, 697.) Claimant continued to see Dr. Nasher during 2007, 2008 and 2009. (Tr. at 574-612, 794-802.)

On February 2, 2006, a State medical consultant, James Egnor, M.D., reviewed Claimant's medical records and concluded that she could perform work at the light exertional level with occasional postural limitations. (Tr. at 420-21.) He indicated that she had no manipulative, visual or communicative limitations (Tr. at 422-23), and should avoid concentrated exposure to extreme cold, vibration, and fumes, odors, etc. (Tr. at 423.) Dr. Egnor viewed her complaints as only partially credible. (Tr. at 426.)

Medical Opinions

On February 21, 2006, Dr. Arvind Viradia opined as follows:

14

> Rhonda Briscoe is under my care since August 2003. She is suffering from Emphysema, Major Depressive Disorder, Psychological Stress, GAD, Obstructive Lung Disease, Lung Cancer, etc. She is disabled to work right now.

(Tr. at 428, 761.) On December 6, 2006, Dr. Viradia wrote a note on a prescription pad which reads: "Ms. Briscoe is suffering from severe depression. Please have Behavior Medicine to evaluate for inpatient treatment." (Tr. at 459.) On August 24, 2009, Dr. Viradia wrote another note on a prescription pad which reads: "Ms. Briscoe is still permanently & totally disabled from medical illnesses including depression, (illegible)." (Tr. at 645.)

On March 6, 2006, Mallinath Kayi, M.D., a lung specialist who treated Claimant from September 5, 2000 to November 28, 2001, wrote a note on a prescription pad stating: "This patient has a history of lung cancer & COPD & anxiety, chronic back pain." (Tr. at 451.) On January 18, 2007, Dr. Kayi wrote another note, "to whom it may concern," stating that Claimant's lung cancer is in remission. (Tr. at 465.) He had last seen her on January 3, 2007; he noted her history of COPD as a result of her chronic smoking, and her severe anxiety depression. (*Id.*) On July 21, 2008, Dr. Kayi wrote that Claimant had "dyspnea secondary to anxiety depression, advanced chronic obstructive pulmonary disease, cancer of the lung." (Tr. at 535.) On September 14, 2009, Dr. Kayi wrote to the ALJ: "Ms. Rhonda Briscoe has been under my care since September 2000. I feel that she is unable to work due to her medical condition. The patient has history of lung cancer, advanced chronic obstructive pulmonary disease, anxiety neurosis and bipolar disorder." (Tr. at 646.) On April 16, 2010, Dr. Kayi wrote that "Ms. Rhonda Briscoe has been under my care since September 2000. She has lung

15

cancer, advanced chronic obstructive pulmonary disease, anxiety neurosis and bipolar disorder." (Tr. at 806.)

On March 8, 2006, A. Karim Katrib, M.D., a Board certified otolaryngologist, wrote a memorandum "to whom it may concern," which states as follows:

> We have seen Ms. Briscoe in our office regarding many illnesses. The patient was diagnosed with small cell carcinoma of her lungs a few years ago. She has been treated with a full dose of chemotherapy as well as radiation therapy.
> The patient has a lot of illnesses and disabilities regarding constant lower back pain as well as many psychological problems. The patient is known to be a heavy smoker for many, many years. There are underlying psychological problems with the situation the patient is going through. The patient is also seeking treatment for her lower back pain at the Pain Clinic. The patient will need very close observation with the condition as she still smokes heavily, subjecting herself to a high risk of recurrent lung cancer. The patient, in my opinion, is unstable to perform any work at this point in time or later.

(Tr. at 429.) Despite the comment that Dr. Katrib has seen Claimant "regarding many illnesses," the record contains no evidence from him. It appears that Dr. Katrib did refer Claimant to neurologist Samer Nasher, M.D., for her back pain. (Tr. at 430-431.)

A note (signature illegible) on a Thomas Memorial Hospital prescription, dated August 10, 2009, reads: "She cannot function due to her mental illness. She will not be able to have a job (gainfully employed)." (Tr. at 647.)

On August 19/27, 2009, Dr. Nasher wrote: "I follow this patient for chronic back pain. She is unable to work. She needs chronic pain management. Her x-ray on Aug. 10, 2006 showed facet joint degenerative changes in the lumbar spine." (Tr. at 648, 802.)

<u>Review of the ALJ's Findings</u>

Claimant does not challenge the ALJ's findings as to her CPD, her lack of

substantial gainful activity, or her severe impairments of COPD, alcohol abuse and depression/anxiety. It appears that she does not dispute that her impairments, considered individually or in combination, did not meet or equal the severity of the Listings in Appendix 1. Moreover, Claimant has had the good fortune of having her lung cancer in remission, despite her smoking, and thus has experienced medical improvement which is related to her ability to work. Claimant does not dispute that she cannot perform her past relevant work as a shirt presser. The only issue is whether, as of June 1, 2005, if Claimant had stopped abusing alcohol, she could have performed substantial gainful activity as a price marker, retail sales attendant, or inspector/sorter.

The record is replete with evidence that Claimant was an alcoholic from at least 2004 (and probably much earlier) and continuing at least until January, 2007. (Tr. at 24-26.) Her abuse of alcohol impaired her ability to perform substantial gainful activity, and there is substantial evidence to support the ALJ's conclusion that while she was abusing alcohol, Claimant could not perform work. However, the Social Security regulations require that a determination be made whether alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535.

The ALJ, in his thorough and lengthy decision, carefully considered and discussed all the evidence pertaining to Claimant's mental and physical ability to work, particularly as of June 1, 2005. After three administrative hearings, and consultation with two medical experts and a vocational expert, the ALJ posed a hypothetical question to the vocational expert which accurately set forth her age, education, work experience. (Tr. at 892.) He described the following limitations: work at the light exertional level; routine, repetitive tasks involving only incidental public contact and frequent contact with

17

co-workers; no exposure to hazards such as unprotected heights or dangerous machinery and equipment; no climbing of ladders, ropes, scaffolds; occasional use of ramps and stairs; occasional balancing, stooping, kneeling, crouching or crawling; no concentrated exposure to extreme heat, cold, vibration, fumes, odors, dust, gases, poor ventilation or pulmonary irritants. (Tr. at 892-93.) In response, the vocational expert identified price marker, retail sales attendant, and inspector/sorter as positions which such a person could perform. (Tr. at 893-94.) These exertional and non-exertional limitations are consistent with the assessment of the State medical consultants, Drs. Gomez (tr. at 352-55) and Egnor (tr. at 420-26), and with Dr. Beard's examination which found only a mild pulmonary impairment and a normal back (tr. at 338-49). The court notes that Drs. Gomez and Egnor did not have access to some of the later-acquired medical records from Dr. Viradia and the 2004 and 2005 x-rays of her back; however, these records, and those of Dr. Nasher, show that Claimant's examinations were basically normal.

Claimant's depression or mood disorder in 2004 and 2005 was overlaid by her alcoholism. Even when she had been hospitalized twice in January of 2005, upon discharge her GAF score was 55 (moderate). Dr. Harlow concluded that her records indicated that her restrictions in activities of daily living and her difficulties in social functioning were "mild." (Tr. at 369.) He indicated that she was "not significantly limited" in her abilities to sustain an ordinary routine without special supervision, work in coordination with others without being disturbed by them, make simple work-related decisions, engage in social interaction, and adapt to changes. (Tr. at 374-75.) When Claimant was evaluated by Ms. Daley, she readily admitted to a "long history of alcohol

18

dependence." (Tr. at 334.) The mental status examination yielded results which were primarily "within normal limits." (Tr. at 336-37.)

The ALJ reviewed each of the medical opinions written by various physicians regarding Claimant, and provided good reasons for the weight he ascribed to each of them. (Tr. at 33-35.) Most of the opinions are not limited to Claimant's ability to function as of June 1, 2005, with abstention from alcohol, thus reducing their relevance.

While Claimant's impairments may have worsened since 2007, there is substantial evidence to support the Commissioner's decision that she was capable of performing substantial gainful activity as of June 1, 2005, if she had stopped abusing alcohol. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Commissioner's decision is supported by substantial evidence.

It is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties and Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the plaintiff, and to transmit the same to counsel of record.

<u>February 21, 2013</u>
    Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge